**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AT&T COMMUNICATIONS, et al. | |
| Plaintiffs, | No. C 06-07271 JSW |
| v. | **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| PAC-WEST TELECOMM INC, et al., | |
| Defendants. | |

## I. INTRODUCTION

Now before the Court are the motion for summary judgment filed by Plaintiffs, AT&T Communications of California, Teleport Communications Group of San Francisco, Teleport Communications Group of Los Angeles, and Teleport Communications Group of San Diego (collectively "AT&T"), the cross-motion for summary judgment filed by Defendant, Pac-West Telecomm, Inc. ("Pac-West"), and the cross-motion for summary judgment filed by Defendants, Michael R. Peevey, Geoffrey Brown, Dian M. Grueneich, John Bohn, of the California Public Utilities Commission (collectively "the CPUC"). Having considered the parties' papers, relevant legal authority, and having had the benefit of oral argument, the Court HEREBY DENIES AT&T's motion and GRANTS the cross-motions filed by Pac-West and the CPUC.

//

//

//

## II. BACKGROUND

The following facts are undisputed, unless otherwise noted. AT&T, a competitive local exchange carrier ("CLEC"), originates traffic that is routed, indirectly, to Pac-West through Pacific Bell Telephone Company ("Pacific Bell")[1] and Verizon California Inc. ("Verizon"), both of which are incumbent local exchange carriers ("ILECs"). Pac-West, which also is a CLEC, terminates the traffic that is originated by AT&T. (*See* Compl., ¶ 31; Pac-West Answer ¶ 31; CPUC Answer ¶ 3.) AT&T and Pac-West have not entered into an interconnection agreement.[2] (*Id.*) Pac-West did, however, enter into interconnection agreements with Pacific Bell and Verizon, the terms of which required Pac-West to invoice the party that originated traffic for any termination charges. (A.R., Vol. I at p. 0006 (Pac-West PUC Compl., ¶¶ 17-18).) Thus, if AT&T originated a call that Pacific Bell routed to Pac-West, and Pac-West terminated the call, Pac-West should have charged AT&T, not Pacific Bell, for the cost of terminating the call.

Notwithstanding the terms of its interconnection agreements with Pacific Bell and Verizon, Pac-West invoiced those entities until July 2001, at which time Pacific Bell and Verizon refused to continue to compensate PacWest for termination charges associated with traffic that Pacific Bell and Verizon did not originate. (*Id.* at p. 0006-7 (Pac-West PUC Compl. ¶ 19 & n.6).)

Accordingly, Pac-West began to invoice AT&T for termination charges on traffic that AT&T originated. The parties agree that some of the traffic that AT&T originated was bound for internet service providers ("ISP-bound traffic"). Pac-West contends that some of the traffic

---

[1] Pacific Bell Telephone Company now conducts business as SBC California. (*See* Administrative Record, Volume III at p. 626 (Decision Granting Complaint (hereinafter "CPUC Decision) at 2).) The Court hereafter shall cite to the Administrative Record as follows "A.R., Vol. __ at p. __."

[2] The terms "CLEC," "ILEC," and "interconnection agreement" are terms derived from amendments to the Communications Act of 1934, which were enacted as part of the Telecommunications Act of 1996. Those amendments are discussed in more detail in Section III.B, *infra*.

2

was VNXX traffic[3], however that dispute is not material to the resolution of this motion. Furthermore, in the CPUC proceedings, Pac-West assumed that all traffic was ISP-bound for the purposes of determining the threshold legal issues. (*See, e.g.,* A.R., Vol I at p. 0094 (Pac-West Opening Brief to CPUC at 6)).

Pac-West's termination charges were based on a state tariff that has been on file with the CPUC since 1998, which purports to set Pac-West's charges for intrastate traffic that is originated by CLECs with whom Pac-West does not have an interconnection agreement. (Compl., ¶ 33; Pac-West Answer ¶ 33; CPUC Answer, ¶ 5.) AT&T refused to compensate Pac-West based on the tariff rates. Accordingly, in October 2004, Pac-West filed a complaint with the CPUC. (Compl., ¶ 35; Pac-West Answer ¶ 35; CPUC Answer ¶ 7; A.R., Vol. I at ¶. 0001-62 (Pac-West CPUC Compl.).)

AT&T argued to the CPUC, as it does here, that, in a ruling entitled *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic*, 16 F.C.C.R. 9151 (2001) ("*ISP Remand Order*"), the Federal Communications Commission ("FCC") determined that ISP-bound traffic was interstate in nature and subject to its jurisdiction and set up a specific compensation regime to govern compensation for ISP-bound traffic. Thus, according to AT&T, under the *ISP Remand Order,* Pac-West must be compensated for the traffic at issue on a "bill and keep" basis.

On June 29, 2006, the CPUC issued a decision in favor of Pac-West and rejected AT&T's interpretation of the *ISP Remand Order.* The CPUC determined that the *ISP Remand Order* did not purport to address the manner in which two CLECs should be compensated for terminating ISP-bound traffic. It also concluded that "it is appropriate to apply the CLEC's intrastate tariff for termination services afforded to another CLEC where no interconnection agreement is in effect between the two CLECs." (A.R., Vol. III at p. 0658 (CPUC Decision at 34).)

---

[3] *See note* 7, *infra*.

3

1    AT&T applied for a rehearing with the CPUC, but when it did not receive a decision
2    within sixty days, AT&T filed its Complaint before this Court. (Declaration of Seth M.
3    Goldstein and Errata thereto ("Goldstein Decl."), Ex. B, Errata Ex. C; A.R., Vol. III at ¶. 0674-
4    93 (AT&T's Application for Rehearing).) Subsequently, on March 1, 2007, the CPUC denied
5    AT&T's application for rehearing. (Goldstein Decl., Ex. D; A.R., Vol. III at ¶. 0707-716
6    (Order Denying Rehearing of Decision).)

7    On July 31, 2006, AT&T paid Pac-West the sum of $7,115,014.16. On August 21,
8    2006, AT&T paid an additional $2,992,673.12, which reflected termination charges due for the
9    period February 1, 2005 to June 1, 2006. AT&T continues to incur charges under Pac-West's
10   tariff and pays those sums into the Court registry. (Compl., ¶ 42; Declaration of Geri Lancaster
11   ("Lancaster Decl.") ¶¶ 1-5, Ex. A; Docket No. 38.)

12   In its Complaint, AT&T alleges that the CPUC did not have jurisdiction to order AT&T
13   to compensate Pac-West pursuant to the rates set forth in the tariff, because the FCC has
14   determined that ISP-bound traffic is interstate in nature and must be compensated pursuant to
15   the interim compensation regime set forth in the *ISP Remand Order*. AT&T further alleges that
16   the CPUC Decision "unlawfully usurps the FCC's exclusive jurisdiction to regulate interstate
17   telecommunications traffic" and "conflicts with and is preempted by" the Telecommunications
18   Act of 1996 ("TCA") and the FCC's implementing decisions." (Compl. ¶¶ 5-6, 49-54.)

19   The Defendants deny those allegations and argue that the CPUC Decision is not
20   preempted by the TCA because, in their view, the FCC has not exercised its jurisdiction over all
21   ISP-bound traffic. They also assert that the *ISP Remand Order* does not clearly preclude state
22   regulation of compensation between two CLECs for ISP-bound traffic, and that the CPUC's
23   decision to apply the tariff to the traffic in question does not conflict with the purposes of the
24   TCA.

## III. ANALYSIS

26   The question presented to this Court for resolution is whether, in the *ISP Remand Order*,
27   the FCC manifested a clear intent to preempt a state agency's ability to regulate the manner in
28   which two CLECs may be compensated for the exchange ISP-bound traffic. This appears to be

4

a matter of first impression. For the reasons set forth in the remainder of this Order, the Court concludes that this issue was not before the FCC when it crafted the *ISP Remand Order*. Therefore, the Court concludes that the CPUC Decision is not preempted by the *ISP Remand Order*.

**A.     Applicable Legal Standards.**

**1.     Standard of Review.**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if the fact may affect the outcome of the case. *Id.* at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The Court reviews the CPUC Decision *de novo* to determine whether it is "consistent with the [TCA] and the implementing regulations," and reviews "all other issues under an arbitrary and capricious standard." *Pacific Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1123 (9th Cir. 2003) ("*Pacific Bell*"); *see also Qwest Corp. v. Washington State Utilities and Transportation Comm'n,* 484 F. Supp. 2d 1160, 1169 (W.D. Wash. 2007) ("*Qwest*").

**2.     Preemption.**

> The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law. Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, ... when there is outright or actual conflict between federal and state law, ... where compliance with both federal and state law is in effect physically impossible, ... where there is implicit in federal law a barrier to state regulation, ... where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, ... or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

5

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986).

"Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Id.* at 369. In such a situation, "the law requires a clear indication that an agency intends to preempt state regulation" and ambiguity will not be sufficient to establish preemption. *See Global NAPs, Inc. v. Verizon New England, Inc.*, 444 F.3d 59, 71-72 (1st Cir. 2006) (hereinafter "*Global NAPs I*"); *see also Global NAPs, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 100 n.7 (2d Cir. 2006) (*GlobalNAPs II*) ("[A] federal agency may preempt state law only if it is acting within the scope of its congressionally delegated authority and the agency makes its intention to preempt clear.") (emphasis added).

**B.     The Telecommunications Act of 1996.**

In order to place the parties' dispute in context, a brief summary of the TCA and subsequent FCC decisions implementing provisions of the TCA is warranted. Congress passed the TCA in order to "foster competition in local telephone markets." *Verizon Maryland Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635, 638 (2002); *see also Pacific Bell*, 325 F.3d at 1118 (noting that Congress passed the TCA to "foster competition ... by neutralizing the competitive advantage inherent in incumbent carriers' ownership of the physical networks required to supply telecommunications services"). In order to achieve that goal, the TCA imposes certain general duties on each telecommunication carrier, including *inter alia*, the duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a)(1). In addition, "all local exchange carriers" ("LECs") have a duty to, *inter alia*, "establish reciprocal compensation arrangements for the transport and termination of telecommunications." *Id.* § 251(b)(5).

The terms of the TCA impose additional duties solely on ILECs. Those duties include "[t]he duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network." 47 U.S.C. § 251(c)(2). ILEC's also have a "duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements to fulfill the duties described in paragraphs

6

1  (1) through (5) of subsection (b) of this section and this subsection." *Id.* § 251(c)(1). The TCA
2  imposes a concomitant duty on a telecommunications carrier that requests interconnection with
3  the ILEC to negotiate the terms of an interconnection agreement in good faith. *Id.*
4  //
5  //

> Section 251 also provides that:
>
> In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that –
> (A) establishes access and interconnection obligations of local exchange carriers;
> (B) is consistent with the requirements of this section; and
> (C) does not substantially prevent implement the requirements of this section and the purposes of this part.

47 U.S.C. § 251(d)(3).

Section 252 sets forth the procedures for negotiation, arbitration and approval of interconnection agreements. For example, it provides for voluntary negotiations, whereby "an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title." *Id.* § 252(a)(1). It also provides that any party may ask a state commission to mediate differences arising during the voluntary negotiations. *Id.* § 252(a)(2). Section 252 also provides for a compulsory arbitration procedure. *Id.* § 252(b), (c). State commissions must approve any interconnection agreement reached through negotiation or arbitration, and a party aggrieved by a state commission's determination may seek judicial review of the decision. *Id.* § 252(e).

**C.  The TCA's Reciprocal Compensation and ISP-bound Traffic.**

The FCC has stated that "reciprocal compensation for transport and termination of calls is intended for a situation in which two carriers collaborate to complete a local call. In this case, the local caller pays charges to the originating carrier, and the originating carrier must compensate the terminating carrier for completing the call." *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act, Interconnection Between*

*Local Exchange Carriers and Commercial Mobile Radio Service Providers,* 11 F.C.C.R. 15499, at 16013 ¶ 1034 (1996) ("*Local Competition Order*"); *see also Verizon California Inc. v. Peevey*, 462 F.3d 1142, 1146 (9th Cir. 2006) ("*Peevey*") ("Under a reciprocal compensation arrangement, the originating LEC must compensate the terminating LEC for delivering its customer's call to the end point."). The FCC also determined that "reciprocal compensation obligations should apply only to traffic that originates and terminates in a local area." *Local Competition Order*, 11 F.C.C.R at 16013 ¶ 1034.

In a perfect world, carriers that originate and terminate traffic for one another would be exchanging traffic on a relatively balanced basis, and the costs of originating and terminating those calls also would be relatively balanced. However, "[w]hen one carrier terminates many more calls than another, ... , unless reciprocal compensation applies, the terminating carrier would be subsidizing its competitor by terminating the competitor's calls for free." *Southern New England Tel. Co. v. MCI Worldcom Comm., Inc.*, 353 F. Supp. 2d 287, 291 (D. Conn. 2005) ("*SNET I*"). The FCC has referred to such conduct as regulatory arbitrage and has "warned time and time again that it will not" be permitted. *Global NAPs II*, 454 F.3d at 95.

The world, however, is not perfect. Although an ISP often will be the termination point for a call, an ISP rarely initiates a call. Thus, traffic to ISPs typically flows only in one direction, and the increase in ISP-bound traffic upset the relative balance associated with reciprocal compensation. The increase in ISP-bound traffic also created opportunities for regulatory arbitrage, because if an LEC targeted ISPs as their customers, that LEC could receive a disproportionate share of compensation under the reciprocal compensation scheme required by the TCA. Accordingly, the FCC examined the issue in an order entitled *In the Matter of Implementation of the Local Competition Provision in the Telecommunications Act of 1996, Intercarrier Compensation for ISP Bound Traffic*, 14 F.C.C.R. 3689 (1999) (the "*Declaratory Ruling*").

Because, in the *Local Competition Order*, the FCC concluded that the reciprocal compensation provisions of Section 251(b)(5) applied only to the transport and termination of local telecommunications traffic, the FCC had to determine whether ISP-bound traffic was

interstate or intrastate in nature "[i]n order to determine what compensation is due when two telecommunications carriers collaborate to deliver a call to an ISP." *Declaratory Ruling,* 14 F.C.C.R. at 3693-94 ¶ 7. Applying an "end-to-end" analysis, the FCC determined that ISP-bound traffic should be considered "interstate" traffic and subject to FCC jurisdiction under 47 U.S.C. § 201, and it concluded that the reciprocal compensation provisions of the TCA "do not govern intercarrier compensation" for ISP-bound traffic. *See, e.g., id.*, 14 F.C.C.R. at 3701-02 ¶ 18, 3706 ¶ 26 n.87. Because there was no federal rule to govern intercarrier compensation for ISP-bound traffic, the FCC concluded that "parties should be bound by their existing interconnection agreements." *Id.*, 14 F.C.C.R. at 3690 ¶ 1; *see also id.*, 14 F.C.C.R. at 3703-06 ¶¶ 24-26. The FCC also allowed state commissions to "determine in their arbitration proceedings at this point whether reciprocal compensation should be paid for ISP-bound traffic." *Id.*, 14 F.C.C.R. at 3704-05 ¶ 25. The United States Court of Appeals for the District of Columbia Circuit, however, rejected the FCC's reasoning, vacated the *Declaratory Ruling*, and remanded the matter back to the FCC for further proceedings. *Bell Atlantic Tel. Co. v. FCC*, 206 F.3d 1, 3 (D.C. Cir. 2000).

On remand, the FCC modified its previous analysis of the issue, but it reached the same conclusion. Specifically, the FCC concluded that all telecommunications traffic was subject to reciprocal compensation, unless it fell within one of the exceptions set forth in 47 U.S.C. § 251(g). *See ISP Remand Order*, 16 F.C.C.R. at 9154 ¶ 3, 9163-64 ¶¶ 23-26, 9166-67 ¶¶ 34-36. The FCC also concluded that ISP-bound traffic fell within "at least one of the three enumerated categories in subsection (g)" and was not subject to the reciprocal compensation provisions of Section 251(b)(5), and it amended the relevant regulations to reflect these conclusions. *Id.*, 16 F.C.C.R. at 9166-67 ¶¶ 34-36; *see* 47 C.F.R. § 51.701. The FCC declined "to modify the restraints imposed by section 251(g) and instead continue[d] to regulate ISP-bound traffic under section 201." *Id.*, 16 F.C.C.R. at 9169 ¶ 40.

The FCC also acknowledged that ISP-bound traffic had created opportunities for regulatory arbitrage and, because the record suggested a need for immediate action, instituted an interim compensation regime that would govern compensation for ISP-bound traffic while it

9

engaged in a rulemaking process. *See generally id.*, 16 F.C.C.R. at 9153-55 ¶ 2-6, 9181-93 ¶¶ 67-88. That interim compensation regime provides for two different modes of compensation.

The first mode provides for rate caps and growth caps. Further, with respect to the rate caps, the FCC adopted a mirroring rule, which requires that an ILEC seeking to benefit from the rate caps for ISP-bound traffic charge the same rates for Section 251(b)(5) traffic. *Id.*, 16 F.C.C.R. at 9186-93 ¶¶ 77-88. When an ILEC chooses not to make a mirroring offer, it must "exchange ISP-bound traffic at the state-approved or state-arbitrated reciprocal compensation rates reflected in their contracts." *Id.*, 16 F.C.C.R. at 9194 ¶ 89. The FCC also implemented "a rebuttable presumption that traffic delivered to a carrier, *pursuant to a particular contract*, that exceeds a 3:1 ratio of terminating to originating traffic is subject to the compensation mechanism set forth in this Order," in recognition of the fact that some carriers were not able to identify ISP-bound traffic. *Id.*, 16 F.C.C.R. at 9187 ¶ 79 (emphasis added).

The FCC provided for a different mode of compensation "where carriers are not exchanging traffic pursuant to interconnection agreements prior to the adoption of this Order (where, for example, a new carrier enters the market or an existing carrier expands into a market it previously had not served)." *Id.*, 16 F.C.C.R. at 9188 ¶ 81. In that situation, "as of the effective date of this Order, carriers shall exchange ISP-bound traffic on a bill-and-keep basis during this interim period."[4] *Id.* This rule is referred to as the "New Markets Rule."

The FCC also stated that:

> [t]he interim compensation scheme we establish here applies as carriers renegotiate expired or expiring interconnection agreements. It does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions. This Order does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime we adopt here. Because we now exercise our authority under section 201 to determine the appropriate intercarrier compensation for ISP-bound traffic, however, state commissions will no longer have authority to address this issue. For this same reason, as of the date this Order is published in the Federal Register, carriers

---

[4] Bill-and-keep is "an arrangement in which neither of two interconnecting networks charges the other for terminating traffic that originates on the other network. Instead, each network recovers from its own end users the cost of both originating traffic that it delivers to the other network and terminating the traffic that it receives from the other network." *ISP Remand Order*, 16 F.C.C.R. at 9153 ¶ 2 n.6.

10

may no longer invoke section 252(i)[5] to opt into an existing interconnection agreement with regard to the rates paid for the exchange of ISP-bound traffic. Section 252(i) applies only to agreements arbitrated or approved by state commissions pursuant to section 252; it has no application in the context of an intercarrier compensation regime set by this Commission pursuant to section 201.

*Id.*, 16 F.C.C.R. at 9189 ¶ 82.

The D.C. Circuit again rejected the FCC's reasons for concluding that ISP-bound traffic is not subject to the reciprocal compensation provisions of the TCA and remanded the matter to the FCC for further proceedings. *WorldCom, Inc. v. FCC*, 288 F.3d 429, 432-33 (D.C. Cir. 2002). The court did not, however, vacate the *ISP Remand Order,* and it left the FCC's interim compensation regime in place. *Id.* at 434; *see also Peevey*, 462 F.3d at 1146 n.1, *Pacific Bell*, 325 F.3d at 1122-23. Thereafter, on October 8, 2004, the FCC issued a ruling in which it determined that it would forbear from applying the growth caps and the New Markets Rule. *In re Petition of Core Communications, Inc. for Forbearance Under 47 U.S.C. § 160(c) From Application of the ISP Remand Order*, 19 F.C.C.R. 20179 (2004) (the "*Core Order*").[6]

**D.     The CPUC Decision Is Not Preempted by Federal Law.**

"A matter may be *subject to* FCC jurisdiction without the FCC having exercised that jurisdiction and preempted state regulation." *Global NAPS I*, 444 F.3d at 71 (emphasis in original). It is clear that, for jurisdictional purposes, the FCC has determined that ISP-bound traffic is predominantly interstate in nature. *See, e.g., Pacfic Bell*, 325 F.3d at 1126 ("Although it is an unsettled question under federal law ... whether ISP traffic is 'local' for purposes of reciprocal compensation provisions in interconnection agreements, the FCC and the D.C. Circuit have made it clear that ISP traffic is 'interstate' for jurisdictional purposes."). AT&T's arguments are premised, in part, on the assertion that the FCC has exercised its jurisdiction over

---

[5]     "A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement." 47 U.S.C. § 252(i).

[6]     To date, the FCC has not issued an order in response to the D.C. Circuit's remand in *WorldCom*, and that court recently ordered the FCC to respond by November 5, 2008. *See In re Core Communications, Inc.*, 2008 WL 2649636 at * 11 (D.C. Cir. July 8, 2008). If the FCC fails to respond, the D.C. Circuit stated that the interim compensation regime would be "vacated on November 6, 2008." *Id.*

11

*all* ISP-bound traffic. The Court concludes that the *ISP Remand Order* cannot be read as broadly as AT&T urges.

For example, in the *Peevey* case, Pac-West asserted that the CPUC could not impose origination charges for interexchange VNXX ISP-bound traffic on the basis that the *ISP Remand Order* preempted "state commissions from imposing any intercarrier compensation not provided for in the order."[7] *Peevey*, 462 F.3d at 1158. The court, however, concluded that "the FCC's imposition of rate caps for ISP-bound traffic, and simultaneous preemption of state authority to address compensation for ISP-bound traffic [were] not relevant" to the parties' dispute. *Id.*

Although this reference to FCC preemption of state authority could, on its face, lend credence to AT&T's position, the *Peevey* court went on to explain that the rate caps were "intended to substitute for the reciprocal compensation that would otherwise be due to CLECs for terminating local ISP-bound traffic. They do not affect the collection of charges by ILECs for originating interexchange ISP-bound traffic. As this issue was not before the FCC when it crafted the ISP Remand Order, the order does not preclude the FCC's ruling." *Id.* at 1158-59. In light of this statement, this Court does not read *Peevey* to hold that the FCC has exercised its jurisdiction over the appropriate compensation for all ISP-bound traffic. *See also Global NAPs I*, 444 F.3d at 72 (holding that "the *ISP Remand Order* does not clearly preempt state authority to impose access charges for interexchange VNXX ISP-bound traffic; it is at best ambiguous on the question, and ambiguity is not enough to preempt state regulation"); *Pacific Bell*, 325 F.3d at 1130 n.15 (finding "no conflict between the CPUC's arbitration decision to approve reciprocal compensation for ISP-bound calls and federal law," and concluding, therefore, that section "251(b)(5) does not preempt a state commission like the CPUC from approving of the inclusion of ISP-bound traffic in reciprocal compensation provisions").

---

[7] The *Peevey* court provides an excellent description of VNXX calls. *See Peevey*, 462 F.3d at 1148. In brief, VNXX calls are calls which appear to the calling party to be local, but which are in fact routed to a different calling area. The CPUC has determined that VNXX calls "should be rated to consumers as a local call, meaning that the originating LEC cannot charge the calling party a toll despite the long-distance nature of the call's physical routing." *Id.*

12

1   The Court finds further support for its conclusion in the *Qwest* case. In that case, Pac-West argued that all ISP-bound traffic, including VNXX ISP-bound traffic, was subject to the interim compensation regime set forth in the *ISP Remand Order*. The district court was not called upon to address the preemptive scope of the *ISP Remand Order*, because the case involved the interpretation of interconnection agreements that incorporated the provisions of *ISP Remand Order* into their terms. However, that court rejected the very argument that AT&T advances in this case and determined that the *ISP Remand Order* could not be construed to eliminate all distinctions between local and interexchange traffic or the "compensation regimes that apply to each - namely, reciprocal compensation and access charges." *Qwest*, 484 F. Supp. 2d at 1170.

The *Qwest* court also noted that the *ISP Remand Order* did not mention VNXX traffic, which it found "unsurprising in light of the questions that prompted the" *Local Competition Order* and the *ISP Remand Order, i.e.* "'whether reciprocal compensation obligations apply to the delivery of calls from one LEC's end-user to an ISP *in the same local calling area* that is served by a competing LEC.' ... The scope of the *ISP Remand Order's* conclusions must therefore be confined to the context of that question." *Id.* at 1172 (quoting *ISP Remand Order*, 16 F.C.C.R. at 9159 ¶ 13) (emphasis in original). Accordingly, the court concluded that the interim compensation regime established in the *ISP Remand Order* did not apply to all ISP-bound traffic. *Id.* at 1170; *see also id.* at 1172-75.

Furthermore, as the *Qwest* court noted, most courts that have examined this issue have reached similar conclusions as to the limited scope of the *ISP Remand Order*.[8] *See id.* at 1173 (citing cases); *see also Global NAPs II*, 454 F.3d at 97 n.6, 99-101; *Global NAPs I*, 444 F.3d at 63 ("We ... hold that the FCC did not expressly preempt state regulation of intercarrier

---

[8] Even the FCC has acknowledged that the *ISP Remand Order* is ambiguous as to whether the interim compensation scheme was intended to cover interexchange VNXX ISP-bound calls and has stated that it "'has not addressed the application of the *ISP Remand Order* to ISP-bound calls outside a local calling area' or 'decided the implications of using VNXX numbers for intercarrier compensation more generally.'" *Global Naps I*, 444 F.3d at 74 (quoting FCC's *Brief for Amicus Curiae*, available at 2006 WL 2415737).

13

1 compensation for non-local ISP-bound calls as are involved here, leaving the DTE free to
2 impose access charges for such calls under state law.").[9]

3 Although these cases support a conclusion that the FCC has not exercised its jurisdiction
4 over all ISP-bound traffic, they do not purport to address the specific issue in this case, namely
5 whether the FCC preempted state authority to regulate compensation for ISP-bound traffic
6 exchanged between two CLECs. Accordingly, as a starting point, the Court must examine the
7 text of the *ISP Remand Order* to determine the FCC's intent. That order is not a model of
8 clarity.

9 For example, the FCC uses the terms "LEC" and "carrier" without modifiers throughout
10 the *ISP Remand Order*. Yet, the FCC also demonstrated that it when it wished to refer
11 specifically to an ILEC or a CLEC, it knew how to do so. *Compare ISP Remand Order*, 16
12 F.C.C.R. at 9153 ¶ 2, 9154-55 ¶¶ 4-5, 9173 ¶ 47, 9181 ¶ 66, 9187-90 ¶¶ 78-83 *with id.* 16
13 F.C.C.R. at 9157 ¶ 8, 9159 ¶ 13, 9182-83 ¶¶ 69-70, 9190 ¶ 84, 9191 ¶ 86.[10] Indeed, the CPUC
14 acknowledged that there is nothing in the *ISP Remand Order* that expressly limits its
15 applicability to an ILEC-CLEC relationship.

16 Notwithstanding the general references to "carriers" and "LECs," the provisions of the
17 interim compensation regime that provide for the rate caps, the growth caps, and the 3:1
18 presumption used to identify ISP-bound traffic, apply only as carriers renegotiate expired or
19 expiring interconnection agreements. *ISP Remand Order*, 16 F.C.C.R. at 9189 ¶ 82; *see also id.*
20 at 9156 ¶ 8 (growth caps are to be calculated based upon "ISP-bound minutes up to a ceiling
21 equal to, on an annualized basis, the number of ISP-bound minutes for which that LEC was
22 entitled to compensation" under an existing interconnection agreement). Under the TCA, only

---

[9] The only authority to the contrary appears to be *SNET I*, *supra*, and *Southern New England Telephone Co. v. MCI Worldcom Communications*, 359 F. Supp. 2d 229 (D. Conn. 2005) ("*SNET II*"), the latter of which denied SNET's motion to alter or amend the judgment in *SNET I*. This Court, however, chooses not to follow the *SNET* court, which did not have the benefit of the FCC's view of the scope of the *ISP Remand Order* at the time it reached its decision.

[10] Defendants argue that a plausible reading of the *ISP Remand Order* is that when the FCC used the term LEC or carrier generically, it intended to use the term to encompass both an ILEC and a CLEC, rather than to refer to any type of carrier.

14

ILECs have a duty to negotiate interconnection agreements, when a CLEC requests interconnection. That fact suggests that the FCC was focused on the relationship between ILECs and CLECs when it crafted the *ISP Remand Order*.

AT&T relies heavily on the New Markets Rule, set forth in paragraph 81, and on paragraph 82 of the *ISP Remand Order* to support its position. Again, nothing in hose paragraphs suggests that they are limited to an ILEC-CLEC relationship. However, in the *Core Order*, the FCC explained the New Markets Rule as follows:

> In this situation, if an *incumbent* LEC has opted into the federal rate caps for ISP-bound traffic, the two carriers must exchange this traffic on a bill-and-keep basis during the interim period. This rule applies, for example, when a new carrier enters a market or an existing carrier expands into a market it previously had not served.

*Core Order*, 19 F.C.C.R. at 20182 ¶ 9 (emphasis added). The FCC's interpretation of the *ISP Remand Order* in the *Core Order* suggests that it did not intend the New Markets Rule to apply broadly to *any* carriers that were not exchanging traffic pursuant to an interconnection agreement. Rather, it intended the New Markets Rule to apply when a CLEC requested interconnection from an ILEC, after the effective date of the *ISP Remand Order*.

Furthermore, in the conclusion of the *ISP Remand Order*, the FCC states that it was striving "to balance the need for an intercarrier compensation regime that has hindered the development of efficient competition in the local exchange and access markets with the need to provide a fair and reasonable transition for CLECs that have come to depend on intercarrier compensation revenues." *Id.* at 9198 ¶ 95. Again, this conclusion suggests that the FCC was focused on the issues attendant to traffic exchanged between ILECs and CLECs.

AT&T also argues that the FCC's concerns about regulatory arbitrage are equally applicable to the CLEC-to-CLEC relationship and to this case in particular, where Pac-West admits that it "employed a business model in which it sought to terminate in-bound traffic and obtain compensation for that service from other LECs" and also admits "that it targeted and enlisted ISPs as customers." (Pac-West Answer ¶ 21.) AT&T again relies on the New Markets Rule to argue that the FCC was trying to avoid creating new opportunities for regulatory

15

arbitrage and to move toward a compensation regime in which carriers would recover more of their costs from consumers, rather than other carriers.

However, the FCC's statements in the *ISP Remand Order* and the *Core Order*, set forth above, and the cases that have interpreted the *ISP Remand Order* imply that the FCC was concerned about CLECs taking advantage of ILECs, not other CLECs. *See, e.g., Global NAPs II*, 454 F.3d at 95 (noting concerns "that would-be competitors may elect to enter the market not so much to expand competition but to take advantage of the relatively rigid regulatory control of the incumbents" and that the FCC has warned that it would not permit competitors "to build their business to benefit almost exclusively from the existing intercarrier compensation schemes at the expense of both the incumbents and consumers"); *Qwest*, 484 F. Supp. 2d at 1175 (although concluding that state commission's interpretation of *ISP Remand Order* could present opportunities for regulatory arbitrage, noting that "[b]y invoking the term 'regulatory arbitrage,' the FCC's [*sic*] was referring to the concern that high, one directional traffic to ISPs allowed *CLECs* to terminate approximately eighteen to forty times more traffic than they originated, creating significant traffic imbalances and a $2 billion annual windfall *from ILECs* through reciprocal compensation on calls to locally situated ISPs") (emphasis added); *SNET I*, 353 F. Supp. 2d at 292 (noting that although ILECs initially were beneficiaries of reciprocal compensation, "CLECs began to target ISPs as customers"); *Notice of Proposed Rule Making In the Matter of Developing a Unified Intercarrier Compensation Regime*, 16 F.C.C.R. 9610, 9616 ¶ 11 (Apr. 19, 2001) (hereinafter "the *NPRM*") ("As a result of these inefficient termination charges, certain CLECs appear to have targeted customers that primarily or solely receive traffic, particularly ISPs, in order to become net recipients of local traffic.").

In that vein, the FCC imposed the mirroring rule only upon ILECs. If the FCC was concerned about the possibility of regulatory arbitrage between two CLECs, it is reasonable to assume that it would have required the mirroring rule to apply to all LECs. Furthermore, in the *NPRM*, the FCC stated that it did not "expect to extend compensation rules to other interconnection arrangements that are not currently subject to rate regulation and *that do not exhibit symptoms of market failure*." *NPRM*, 16 F.C.C.R. at 9612 ¶ 2 (emphasis added). The

16

FCC explained this statement by noting that, "we do not contemplate a need to adopt new rules governing CLEC-to-CLEC ... arrangements." *Id.* at 9675 n.2. From this statement, one can infer that FCC did not believe that CLEC-to-CLEC relationships exhibited the types of market failure underlying its concerns about regulatory arbitrage. This provides further support for the Court's conclusion that the FCC was not focused on compensation arrangements between two CLECs when it crafted the *ISP Remand Order*.

Finally, Pac-West's tariff applies only in the absence of an interconnection agreement. While it does not appear that Pac-West could invoke Section 252 to compel AT&T to enter into an interconnection agreement, the CPUC Decision does not prevent AT&T and Pac-West from voluntarily negotiating the terms of an interconnection agreement to determine the method by which they will compensate one another for the traffic they exchange. Therefore, the CPUC Decision does not conflict with the FCC's goals of encouraging voluntary negotiations to address intercarrier compensation. *See, e.g., Missouri v. Sprint Spectrum L.P.*, 112 S.W.3d 20, 25-26 (2003) (concluding that state commission decision to rely on tariff as basis for compensating rural exchange carriers for terminating traffic originated by wireless carriers was not preempted by TCA, where tariff was subordinate to any negotiated agreement under the TCA).[11]

Accordingly, the Court finds that the question of how two CLECs should be compensated for the exchange of ISP-bound traffic was not before the FCC when it crafted the *ISP Remand Order* and, therefore, concludes that the *ISP Remand Order* does not govern the parties' relationship. For the reasons set forth above, the Court also concludes that the CPUC

---

[11] Because the instant case involves two CLECs, rather than an ILEC and a CLEC, it is distinguishable from *Verizon North Inc. v. Strand*, 367 F.3d 577 (6th Cir. 2004). In that case, the Sixth Circuit concluded that an order requiring Verizon, an ILEC, to pay termination charges based on a CLEC's tariff was preempted by the TCA because it bypassed "the federal statutory process for reaching an interconnection agreement and to create a competitive relationship via the filing of a unilateral tariff. Instead of achieving a reciprocal compensation arrangement via the negotiation and arbitration mechanism provided in the Act, the MPSC permitted the institution of an interconnection agreement by fiat." *Id.*, 367 F.3d at 584. As previously noted, the TCA imposes duties upon ILECs and CLECs to negotiate interconnection agreements in good faith. The TCA imposes no such duties upon two CLECs.

17

1  Decision to apply the Pac-West tariff does not conflict with the TCA and the FCC's

2  implementing regulations. Accordingly, the CPUC Decision is not preempted by federal law.

## CONCLUSION

For the foregoing reasons, the Court HEREBY DENIES AT&T's motion for summary judgment and GRANTS each of the Defendants' cross-motions for summary judgment. The Clerk is directed to release the funds from the Court registry to Pac-West within thirty (30) days of the date of this Order. A separate judgment shall issue, and the Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: August 12, 2008

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE